[Cite as *State v. Marques*, 2019-Ohio-42.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-849 |
| v. | : | (C.P.C. No. 16CR-1934) |
| Omar F. Marques, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on January 10, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee. **Argued:** *Steven L. Taylor*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

APPEAL from the Franklin County Court of Common Pleas

KLATT, P.J.

{¶ 1} Defendant-appellant, Omar F. Marques, appeals from a judgment of the Franklin County Court of Common Pleas convicting appellant of kidnapping with sexual motivation specification in violation of R.C. 2905.01, and two counts of rape in violation of R.C. 2907.02. For the following reasons, we affirm.

I. Facts and Procedural History

{¶ 2} On April 8, 2016, a Franklin County Grand Jury indicted appellant with one count of kidnapping in violation of R.C. 2905.01 with specification (restraint for the purpose of engaging in sexual activity as defined in R.C. 2907.01), one count of rape in violation of R.C. 2907.02 (vaginal intercourse compelled by force or threat of force), and

one count of rape in violation of R.C. 2907.02 (vaginal intercourse when defendant knew or had reasonable cause to believe that the victim's ability to resist or consent was substantially impaired because of a mental or physical condition or because of advanced age). The charges arose out of an incident with T.D.P. Appellant entered a not guilty plea and proceeded to a jury trial.

{¶ 3} The testimony at trial indicates that on Saturday, November 7, 2015, at about 1:00 p.m., T.D.P. went to a gas station near her home with her dog and purchased a bottle of wine. Prior to the purchase, she had consumed a couple glasses of wine, but she testified she was not intoxicated. Next door to the gas station was a house. On previous walks with her dog over the past few months, T.D.P. had frequently waived a greeting at one or two men if they were out on the porch of the house. On this day, as T.D.P. walked by the house with her dog, appellant came off the porch and came to the fence in front of the lot and asked her how she was doing. T.D.P. had not met appellant before. As a friendly gesture to get to know a neighbor, T.D.P. asked appellant if he wanted to share a glass of wine with her on appellant's porch. Appellant agreed.

{¶ 4} Appellant stated there was a problem with the front door, so they went into the kitchen through the back door to open the wine bottle. Appellant produced a large knife that he stuck into the top of the wine bottle. T.D.P. did not see anyone else in the house. T.D.P. began to feel uncomfortable and went to get her dog. At that moment, appellant knocked her to the floor. T.D.P. got up and appellant knocked her down again. They began to struggle. The struggle went from the kitchen into an adjacent room. Ultimately, appellant held T.D.P. down with one arm and tried to pull her pants down with his other arm. T.D.P. believed that appellant was attempting to forcibly have sex with her and she repeatedly told him no. Appellant was struggling to get T.D.P.'s pants down with one hand, so he took his other arm off T.D.P. to use both hands. T.D.P was then able to grab her cell phone from the pocket of a blue jean jacket she was wearing and called 911. She heard the dispatcher answer, but appellant immediately took the phone from her and apparently ended the call because T.D.P. heard the phone ring back shortly thereafter but she could not answer it. T.D.P. then blacked out.

{¶ 5} When she came to, T.D.P. was in the backyard of the house trying to open a latch on a gate. Although she had her dog, she was disoriented. Her pants were on but not

fastened and her underwear was down around her thighs. T.D.P knew she had been assaulted but did not know if she had been raped. She was scared and did not know what to do. When she got out through the gate, she called a friend. The time log on her phone indicated that there was a three-minute timeframe between the call to 911 and the first call to a friend. She then ran home.

{¶ 6} After she was home, T.D.P. made numerous calls to friends and to her son. She was in shock and did not know what to do. Friends encouraged her to report the incident to the police and not to change her clothes. When she went to the bathroom, she could smell what she believed was sperm. That further prompted her to want to call the police. Nevertheless, it took her until the next day to get brave enough to report the attack to the police. During her testimony, T.D.P., identified appellant as the person who attacked her.

{¶ 7} Columbus Police Officer Jennifer Mancini testified that on November 8, 2015, she responded to a report of a sexual assault. Mancini met T.D.P. at her home. Mancini stated that T.D.P. appeared to be in shock. T.D.P. told Mancini that she believed she was sexually assaulted the day before and that she was still wearing the same clothes that she wore at the time of the attack. T.D.P. agreed to go to the hospital to be examined for a rape kit. T.D.P. also told Mancini that she had called 911 during the attack. Mancini verified that T.D.P.'s phone recorded a call to 911 at 1:05 p.m. the previous day. Mancini drove T.D.P. to Grant Hospital. On the way to the hospital T.D.P. pointed out the house where the attack occurred. Upon arriving at the hospital they were met by detectives of the Columbus Police Department who took over the investigation.

{¶ 8} Allison Fish, a licensed sexual assault nurse, testified that she examined T.D.P. on November 8, 2015. Between the time of the attack and the examination, T.D.P. indicated that she had gone to the restroom several times and had wiped. T.D.P. reported to Fish that on the previous day she had been sexually assaulted and thrown to the floor. She also reported that she fought with the attacker. T.D.P. indicated she had bruises from the attack and was sore.

{¶ 9} Fish documented that T.D.P. had bruising and scrapes to her left knee, a bruise on her left calf, a scrape to her right knee, a bruise to her left posterior thigh, a bruise to her right posterior thigh, and a scrape to her left upper back. Fish's examine did not

reveal physical trauma to T.D.P.'s vagina. However, Fish indicated that the absence of physical trauma to the vagina does not mean that penetration did not occur as penetration often occurs without any signs of trauma because the vaginal tissue stretches.

{¶ 10} As part of the rape kit, Fish collected vaginal, anal, perianal, and oral swabs from T.D.P., as well as material from her fingernails. Fish also collected T.D.P.'S underwear. Fish testified that it is important to collect the underwear because fluids from the vagina, including semen, can pool in the underwear. Fish further stated that it would not be surprising for a vaginal swab to be negative for semen, but the underwear positive, especially if the woman has gone to the bathroom and wiped afterward.

{¶ 11} Columbus Police DNA analyst Miranda Aufiero testified that she tested T.D.P.'s underwear and found the presence of semen.

{¶ 12} Columbus Police DNA analyst Jessica Damon testified that she analyzed five items collected from T.D.P.: vaginal swabs, perianal swabs, fingernail swabs, a cutting from a stain in the crotch of underwear, and a cutting from near the waistband of her underwear. Her analysis indicated that a quantity of male DNA was detected from the vaginal swabs, fingernail swabs, and both cuttings from the underwear. Spermatozoa were microscopically observed on the cuttings from the underwear. DNA testing of the underwear cuttings and fingernail material established a match with appellant's DNA profile.[1] Although some male DNA was detected on the vaginal swabs, the quantity was too low to yield a specific profile.

{¶ 13} After the state rested its case, appellant moved for a judgment of acquittal pursuant to Crim.R. 29. The trial court denied the motion. Appellant rested without calling any witnesses.

{¶ 14} Based upon the evidence presented, the jury found appellant guilty of all three counts. The trial court merged the counts for purposes of sentencing. The state elected to proceed to sentencing as to Count 2 only. The trial court sentenced appellant accordingly.

{¶ 15} Appellant appeals assigning the following error:

> The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the

---

[1] Columbus Police Detective Thomas Beenham testified that he collected the known DNA sample from appellant.

United States Constitution and Article One[,] Section Ten of the Ohio Constitution by finding him guilty of rape and kidnapping as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence.

## II. Legal Analysis

{¶ 16} Appellant's single assignment of error raises two distinct issues: (1) whether the guilty verdicts are supported by sufficient evidence; and (2) whether the guilty verdicts are against the manifest weight of the evidence. These issues involve different standards of review.

{¶ 17} "Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 18} "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *Kurtz* at ¶ 16, citing *State v. Yarborough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that " 'in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime' "). Further, " 'the testimony of one witness, if believed by the jury, is enough to support a

conviction.' " *Patterson* at 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 19} "In considering a defendant's claim that a jury verdict is against the manifest weight of the evidence, '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 20, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Further, '[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Williams* at ¶ 20, quoting *Martin* at 175.

{¶ 20} "Unlike the standard of review for sufficiency of the evidence, 'a reviewing court does not construe the evidence most strongly in favor of the prosecution when using a manifest-weight standard of review.' " *Williams* at ¶ 21, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, ¶ 81 (2d Dist.). The manifest weight of the evidence challenge "questions the believability of the evidence and asks a reviewing court to determine which of the competing inferences is most believable." *Id.* However, an appellate court " 'may not substitute its judgment for that of the trier of fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way.' " *Williams* at ¶ 21, quoting *Woullard* at ¶ 81.

### A. Kidnapping (Count 1)

{¶ 21} R.C. 2905.01(A) states:

> No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]

{¶ 22} R.C. 2907.01(C) defines "[s]exual activity" as "sexual conduct or sexual contact, or both." In turn, "[s]exual conduct" is defined in R.C. 2907.01(A) as follows:

> "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 23} T.D.P. testified that appellant held her down and forcibly attempted to have sex with her. T.D.P. struggled with appellant to free herself. She called 911 and blacked out after appellant took her phone. T.D.P.'s testimony supports a finding that appellant restrained her liberty. The state also presented evidence that DNA from semen stains taken from T.D.P.'s underwear matched appellant's DNA. Therefore, DNA analysis confirms that appellant engaged in sexual activity. This evidence is sufficient to support the conviction for kidnapping with sexual motivation.

{¶ 24} Appellant presented no evidence to rebut T.D.P.'s testimony that appellant, by force, restrained her liberty for the purpose of engaging in sexual activity. Nor does appellant present any argument on appeal that challenges the kidnapping conviction. This is not the exceptional case in which the evidence weighs heavily against the conviction. The kidnapping conviction is not against the manifest weight of the evidence.

## B. Rape (Counts 2 and 3)

{¶ 25} Appellant's sole argument on appeal is that the rape convictions must be reversed because the state presented no evidence that appellant penetrated T.D.P.'s vaginal opening during the sexual assault. We disagree.

{¶ 26} R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." In addition, R.C. 2907.02(A)(1) states that "[n]o person shall in engage in sexual conduct with another * * * when any of the following applies:"

> (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 27} " 'Sexual conduct' means vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another.  Penetration, however slight, is sufficient to complete vaginal or anal intercourse."  R.C. 2907.01(A).

{¶ 28} Here, the trial court convicted appellant of rape (vaginal intercourse) by force, or threat of force (Count 2), and rape (vaginal intercourse) when the offender knew or had reasonable cause to believe that T.D.P.'s ability to resist or consent was substantially impaired because of mental or physical condition or because of advanced age.  (Count 3.) Because T.D.P. blacked out during the course of the sexual assault, the state attempted to prove rape by vaginal intercourse through circumstantial evidence.  Appellant challenges the sufficiency and manifest weight of that evidence.

{¶ 29} It is well-established that a criminal conviction can be based in whole or in part on circumstantial evidence.  *State v. Nicely*, 39 Ohio St.3d 147 (1988).  "Circumstantial evidence and direct evidence inherently possess the same probative value.  In some instances certain facts can only be established by circumstantial evidence."  *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991), superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102 (1997).  "Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt."  *Jenks* at 272.

{¶ 30} The record reveals there is significant circumstantial evidence to support the trial court's guilty verdicts for rape.  T.D.P. testified that appellant attacked her, held her down, and tried to forcibly remove her tightfitting jeans.  Based on appellant's actions, T.D.P. believed appellant was trying to have sex with her by force.  T.D.P. struggled with appellant and repeatedly told him no.  T.D.P. sustained bruising as a result of the struggle. However, she blacked out during the course of the struggle after her 911 call was unsuccessful.  When T.D.P. regained her senses, she was outside the house.  She was in shock and scared.  Her pants were unfastened and her underwear was down around her thighs.  After running home, she went to the bathroom and smelled what she thought was semen.  On advice from friends and a family member, she did not change her clothes or underwear.

{¶ 31} The following day, after contacting the police, T.D.P. was taken to the hospital where she was examined. That examination revealed a number of bruises and scrapes on her body that were consistent with a struggle. A licensed sexual assault nurse collected from T.D.P. vaginal, anal, perianal, and oral swabs as well as material from her fingernails. The nurse also collected cuttings from T.D.P.'s underwear. Testing of those cuttings revealed the presence of semen. DNA analysis of the underwear cuttings and the fingernail material indicated a match with appellant's DNA.

{¶ 32} Significantly, testing of the vaginal swab revealed the presence of male DNA, although the quality was too low to yield a specific profile. T.D.P. testified that she had not had consensual sex with anyone for 48 hours prior to the attack. After the attack, T.D.P. used the restroom several times and wiped. The sexual assault nurse testified that if a victim wipes after urination or defecation, the victim would be wiping away some of the DNA evidence. The nurse also testified that vaginal fluids can leak out of the vagina and pool on the underwear when the victim stands, which is why stains on underwear are always tested. Therefore, there is strong circumstantial evidence that appellant raped T.D.P. by vaginal intercourse based upon: (1) the presence of male DNA on the vaginal swab; (2) actions by appellant consistent with his desire to forcibly have sex with T.D.P.; (3) T.D.P.'s underwear down around her thighs shortly after the attack; (4) the likelihood of pooling of vaginal fluids in T.D.P.'s underwear after the attack; and (5) semen stains on T.D.P.'s underwear that matched appellant's DNA.

{¶ 33} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jenks* at paragraph two of the syllabus.

{¶ 34} We note that "[p]enetration, however slight, is sufficient to complete vaginal intercourse." R.C. 2907.01(A). We find that appellant's convictions for rape are supported by sufficient evidence. As previously noted, there is substantial circumstantial evidence of penetration. In addition, there is no indication that the jury clearly lost its way and created

a manifest miscarriage of justice. Appellant presented no evidence to rebut the state's evidence. Therefore, the rape convictions are not against the manifest weight of the evidence.

{¶ 35} For these reasons, we overrule appellant's assignment of error, and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and BRUNNER, JJ., concur.